IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | § |
| | § |
| v. | §   EP-23-CR-2182-DB |
| | § |
| JACOB HERNANDEZ | § |

### MEMORANDUM OPINION AND ORDER
### DENYING DEFENDANT'S MOTION TO DISMISS

On this day, the Court considered the above-captioned case. On January 2, 2024, Defendant Jacob Hernandez ("Defendant") filed his "Motion to Dismiss," ("Mot.") ECF No. 23.[1] On January 16, 2024, the Government filed its Response to Defendant's Motion, ECF No. 27. Defendant then filed his Reply to the Government's Response on January 24, 2024, ECF No. 32. In his Motion, Defendant asks the Court to dismiss his criminal case because the Government deported witnesses who Defendant reasonably believes would have been material and favorable witnesses to the Defendant's case. Defendant also requests the Court dismiss his case because Defendant believes that Border Patrol is manufacturing venue in the Western District of Texas. The Court now addresses Defendant's "Motion to Dismiss" ECF No. 23.

### BACKGROUND

Defendant Jacob Hernandez ("Defendant") was arrested on October 16, 2023. *See* Complaint (Compl.) 2, ECF No. 1. On November 8, 2023, Defendant was charged by Indictment with two counts: (1) Conspiracy to Transport Aliens (in violation of 8 U.S.C. §§

---

[1] "ECF No." refers to the Electronic Case Filing ("ECF") number for documents docketed in this matter. When a discrepancy exists between page numbers on filed documents and page numbers assigned by the ECF system, the Court will use the latter page numbers.

1324(a)(1)(A)(v)(I), (a)(1)(A)(ii) and (a)(1)(B)(i)) and (2) Transporting Aliens for Financial Gain (in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii) and (a)(1)(B)(i)). Indictment, ECF No. 14.

Defendant is accused[2] of transporting a group of Undocumented Non-Citizens (UNCs) from the District of New Mexico into the Western District of Texas. *See* Complaint, ECF No. 1. On the night of October 16, 2023, authorities were conducting surveillance operations in Santa Teresa, New Mexico. *Id.* at 2. Agents observed a group of suspected UNCs at a warehouse and observed a black Ford Escape approach the warehouse. *Id.* Agents saw the black Ford Escape exit the warehouse and agents began following the vehicle. *Id.* Agents followed the vehicle until it reached the Speedway gas station located on Doniphan Drive and Mesa Street in El Paso, Texas (in the Western District of Texas). *Id.* Defendant exited the vehicle to pump gas, and agents approached him and began speaking with him. *Id.* Defendant was taken into custody and advised the agents that there was a firearm in the vehicle. *Id.* Agents observed three other individuals sitting in the car. *Id.* All four individuals were transported to the Santa Teresa Border Patrol Station in Santa Teresa, New Mexico.[3] *Id.* Through interviews, the agents learned that the individuals in the vehicle had entered the United States illegally. *Id.* They also learned that Defendant was being paid $500 per person to transport the individuals. *Id.* Defendant advised the agents that the black Ford Escape belonged to him. *Id.*

---

[2] The Court compiles the following allegations against Defendant after reviewing the Complaint Affidavit and motions and responses from both parties.

[3] The Santa Teresa Border Patrol Station is within the El Paso Sector. The Sector covers the counties of El Paso and Hudspeth in the state of Texas and the entire state of New Mexico. See https://www.cbp.gov/border-security/along-us-borders/border-patrol-sectors/el-paso-sector-texas.

The Court does want to address the facts involving the driver of the Ford Escape, Paulo Segura. Defendant was not the driver of the vehicle on October 16, 2023. *Id.* The driver of the vehicle was an individual named Paulo Segura ("Mr. Segura"). *Id.* At the time that Defendant and Mr. Segura stopped at the Speedway gas station, Mr. Segura allegedly "ran inside the Speedway convenience store and barricaded himself," after producing a handgun and pointing it at the officers who pulled over Defendant and Mr. Segura. *Id.* The Court will spend more time addressing this incident later in the Order.

## **LEGAL STANDARDS**

### A. Motion to Dismiss

Federal Rule of Criminal Procedure 12(b)(2) provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue." *United States v. Flores*, 404 F.3d 320, 325 (5th Cir. 2005) (abrogated on other grounds by *United States v. Garcia*, 707 F. App'x 231 (5th Cir. 2017)). "The supervisory powers of the district court allow it to impose the extreme sanction of dismissal of an indictment with prejudice only in extraordinary situations." *United States v. Fulmer*, 722 F.2d 1192, 1195 (5th Cir. 1983). "[A] district court may dismiss an indictment with prejudice only where it has been shown that governmental misconduct or gross negligence in prosecuting the case has actually prejudiced the defendant." *Id.*

In the Fifth Circuit, "the propriety of granting a motion to dismiss an indictment under FED. R. CRIM. P. 12 by pretrial motion is by-and-large contingent upon whether the infirmity in the prosecution is essentially one of law or involves determinations of fact." *Flores*, 404 F.3d 320, 324 (5th Cir. 2005) (internal citations omitted). "If a question of law is involved, then consideration of the motion is generally proper." *Id.* (internal citations omitted). In *Flores*,

the Fifth Circuit found that "the district court properly ruled on the pretrial motion because it involved an issue of law and not a factual dispute." *Id.* at 325.

### B. Compulsory Process

The Sixth Amendment of the Constitution of the United States entitles an accused person "to have compulsory process for obtaining witnesses in his favor." Amend. VI, U.S. Const. "This right is a fundamental element of due process law." *United States v. Hernandez*, 347 F. Supp. 2d 375, 378 (S.D. Tex. Nov. 5, 2004) (quoting *Washington v. Texas*, 388 U.S. 14, 19 (1967)). "When the government deports an illegal alien, before defense counsel has an opportunity to interview the alien, the constitutional right of compulsory process is implicated." *United States v. Gonzales*, 436 F.3d 560, 577 (5th Cir. 2006) (citing *United States v. Valenzuela-Bernal*, 458 U.S. 858 (1982)).

*United States v. Valenzuela-Bernal* established the test "to determine whether a Sixth Amendment violation occurs when the Government deports an illegal alien before defense counsel has the opportunity to interview the alien." *Hernandez*, 347 F. Supp. 2d at 378—379. A defendant "seeking to show denial of due process or denial of Sixth Amendment right of confrontation because of the deportation of an alien witness must make some plausible explanation of the assistance that he would have received from the testimony of the deported witnesses." *United States v. Valenzuela-Bernal*, 458 U.S. 858 (1982). A defendant cannot make a showing of a violation of the compulsory process element of the Sixth Amendment simply by showing the deportation of the aliens deprived the defendant of the alien witness's testimony. *Id.* at 858—59. Instead, the defendant "must at least make some plausible showing of how [the aliens'] testimony would have been both material and favorable to his defense." *Id.* at 859.

4

"Interpretation of *Valenzuela*[-Bernal]'s doctrine, however, has not been uniform: several circuits have held that a defendant bears the initial burden of showing that the Government acted in bad faith – even though the *Valenzuela*[-Bernal] Court did not explicitly require such a showing – and that the Government's conduct prejudiced the defendant's case." *Hernandez*, 347 F. Supp. 2d at 379. For example, the Seventh Circuit held that "[i]f bad faith is shown, the defendant has satisfied the first prong of the *Valenzuela-Bernal* test, but he must still show that the evidence would be material and favorable to his defense." *Chaparro-Alcantara*, 226 F.3d 616, 624 (7th Cir. 2000). Notably, the "Defendant must show bad faith when Government allowed witness to voluntarily depart." *Id.*

But *Hernandez* states that "Fifth Circuit case law is of little help in determining the applicability of bad faith as a factor." *Hernandez*, 347 F. Supp. 2d at 380. In *Hernandez*, the Court noted that there is not a clear mandate from the Fifth Circuit that dictates that bad faith on the part of the Government is a requisite when establishing a violation of a defendant's compulsory process or due process rights, nor has the Fifth Circuit defined the precise contours of "bad faith." *See id.* at 381.

Aside from whether a showing of bad faith is required under *Valenzuela-Bernal*, another issue for the Court to consider is the Government's dual roles in complying with the Sixth Amendment to the United States Constitution, as well as complying with its duty to enforce the immigration laws of the United States. The Government "may . . . find itself confronted with the obligation of prosecuting persons in the position of respondent on criminal charges, and at the same time obligated to deport other persons involved in the event in order to carry out the immigration policies that Congress has enacted." *Valenzuela-Bernal*, 458 U.S. at 864. "The

power to regulate immigration—an attribute of sovereignty essential to the preservation of any nation—has been entrusted by the Constitution to the political branches of the Federal Government. *Id.*

## ANALYSIS

Defendant alleges that dismissal is warranted under two grounds: 1) the Government deported the undocumented migrants who were the subject of Defendant's alleged transportation and whom counsel reasonably believes would have been material and favorable witnesses for the defense, and 2) Border Patrol appears to have engaged in a systematic and misguided approach to manufacture venue in the Western District of Texas. The Court will analyze both of Defendant's arguments in turn.

1. **The Government's deportation of undocumented migrants did not violate Defendant's due process rights under the Fifth Amendment or compulsory rights under the Sixth Amendment**

   The parties agree that the individuals that were in Defendant's car at the time of his arrest were subsequently deported from the United States. *See* Mot. 3, ECF No. 23; *See also* Resp. 4, ECF No. 27. Defendant argues that "[t]he Government's decision to remove these individuals, despite their statements, strongly suggests that their deportation was specifically designed to impair the defense." Mot. 5, ECF No. 23. The Government responds that Defendant "has failed to show the aliens' testimony would be favorable and material." Resp. 5, ECF No. 27. In his Reply, Defendant argues that the witnesses "[c]ould have confirmed that they did not speak to [Defendant], did not have prior contact with [Defendant], and that he was less culpable or involved than the driver, weighing on his knowledge of their status and his intent." Reply 1–2, ECF No. 32.

Defendant states that "[t]he witnesses apparently had no prior contact with [Defendant] and never spoke with him while they were in the car." Mot. 7, ECF No. 23. He argues that "[t]he Government has to prove that [Defendant] knew that the individuals were unlawfully present and that he transported them with intent to further their unlawful presence." *Id.* Defendant's argument that the Government has to prove that he knew the individuals were unlawfully present is undercut by Defendant's own testimony found in the Homeland Security Investigations' ("HSI") "Report of Investigation," dated October 26, 2023, ("Report") Mot. Ex. 3, ECF No. 23. In its Report, HSI states that after Defendant was arrested and detained at the Santa Teresa Border Patrol Station he was "being paid to transport UNC's for $500 per person. He stated he knew the three subjects in his vehicle were UNC's. He stated the Ford Escape was his car." *Id.*

Defendant includes in his filing the statements given by the UNCs to the El Paso Police Department on October 16, 2023. *See* Mot. Ex. 5, ECF No. 23. The statements that Defendant includes are from witnesses Diaz-Hernandez ("Witness Diaz-Hernandez"), Lopez-Dueñas ("Witness Lopez- Dueñas), and Gonzalez-Martinez ("Witness Gonzalez-Martinez"), collectively "the migrant witnesses." *Id*[4]. The Court will address the statements by each of these witnesses in turn.

Witness Diaz-Hernandez's statement was voluntarily given to the El Paso Police Department on October 16, 2023, at 1:04pm. *Id.* He states that "we got into the car and there

---

[4] These statements are written in Spanish, and Defendant did not provide the Court with any certified translations of the documents. The Court, however, does speak Spanish, and in the Court's opinion the translations included in this Opinion are correct. The Court is also including in footnotes the direct quotes in Spanish from the declarations made by the migrant witnesses, included are any grammatical errors. The Court has not modified the original statements in any way. Further, the entirety of the statements is available in the file.

7

were two men, the driver and the front passenger. We began to drive but I did not know where they were taking us. The men spoke only in English, and the driver who was bald looked nervous. He began to drive erratically and run through traffic lights."[5] He goes on to say that "[he] never saw the bald man or the front seat passenger with firearms when they were in the car. [He] never heard any shots when they were outside of the store. That is all that [he] saw and heard."[6] *Id.*

Witness Lopez-Dueñas's statement was voluntarily given to the El Paso Police Department on October 16, 2023, at 1:00pm. *Id.* This witness states that "[he] did not pay any attention to the driver or the passenger of the car. And neither did we speak with them. That is all of the information that I have."[7] *Id.*

Witness Gonzalez-Martinez's statement was voluntarily given to the El Paso Police Department on October 16, 2023, at 1:38pm. *Id.* He states that the "the car was driven by a man and I think he was wearing glasses. There was also another man who was a passenger sitting in the front seat. The men did not speak with us at all. They were just speaking amongst themselves in English."[8] *Id.* Witness Gonzalez-Martinez goes on to state that he "did not see whether the men who picked them up were armed."[9] *Id.* He goes on to say that he "did not

---

[5] Entramos en la camioneta y habia dos hombres, el chofer y el copiloto. Empezaron a manejar pero no sabiamos a donde nos llevaban. Ellos hablaban puro ingles y el chofer que estaba pelon se vio como que estaba nervioso. Empezo a manejar erratico y se empezo a pasarse semaforos.

[6] Yo nunca vi que el pelon ni el copiloto tenian armas cuando estabamos en la camioneta. Yo nunca escuche disparos cuando nos tenian ahi afuera de la tienda. Eso es todo lo que yo vi y escuche.

[7] No puse atencion a el manejador ni al pasajero. Tampoco hablamos con ellos. Esto es toda la informacion que tengo.

[8] La camioneta la iba manejando un hombre y creo que traia lentes. Tambien habia otro hombre de pasajero en el asiento de enfrente. Ellos no nos hablaron para nada. Ellos nomas estaban hablando ingles entre ellos.

[9] Yo no vi si los hombres que nos recogieron andaban armados.

know the driver or the front seat passenger. [He] did not know their names and knew nothing about them. [He] does not have any information about this case."[10] *Id.*

Defendant claims that the UNCs' testimony could have shown that Defendant was somehow less culpable than Mr. Segura, "weighing on his knowledge of their status and his intent." Reply 2, ECF No. 32. However, the one thing that all of the UNCs' testimonies have in common is that they claim to not know Defendant and say that neither Defendant nor Mr. Segura spoke with them when they were driving from New Mexico to El Paso. *See* Mot. Ex. 5, ECF No. 23. Officers from the El Paso Police Department spoke with each of these individuals when they were taken to the Santa Teresa Border Patrol Station, and nothing in their statements indicate that they knew anything about Defendant, Mr. Segura, where they were being taken, or anything else about the operation. *Id.* Further, two of the UNCs state that Defendant and Mr. Segura were speaking English to each other and not speaking to the UNCs in the car. *Id.*

The Court agrees that Defendant's compulsory process rights under the Sixth Amendment *have* been implicated because the individuals he is accused of transporting were deported before trial. *See Gonzales*, 436 F.3d at 577. However, while these rights have been implicated, the Court does not find that Defendant's compulsory process rights were violated. Because the Fifth Circuit has not directly addressed the issue of "bad faith" in its application of *Valenzuela-Bernal*'s principles, *see Hernandez*, 347 F.Supp.2d at 380, this Court declines to apply the heightened standard of proving bad faith on the part of the Government in the instant case. But even with this lower standard, the Defendant has in no way demonstrated to the Court

---

[10] Yo no conozco al chofer oh al pasajero de la camioneta. Yo no se como se llaman y no se nada de ellos. Yo ya no tengo informacion sobre el caso.

that the UNCs' testimony would have been "favorable and material" *Valenzuela-Bernal*, 458 U.S. at 859, to his defense or case in general.

### *Conclusion*

The Court finds that any potential testimony the UNCs could have given would not be "favorable and material." The Court further finds that Defendant's compulsory process and due process rights under the Fifth and Sixth Amendment were not violated.

There is a delicate balance between Defendant's Sixth Amendment Right to a fair trial and the Government's duty to deport individuals who are not admissible to the United States. The Court does not agree with Defendant's assertion that the "Government's decision to remove these individuals . . . strongly suggests that their deportation was specifically designed to impair the defense." Mot. 5, ECF No. 23. The Court believes that the Government officials who deported the UNCs were just carrying out the duties of their job. Dismissal is not appropriate on these grounds because the Court does not find that this government conduct, rather than misconduct, prejudiced Defendant.

### 2. The Court does not find that Border Patrol engaged in a systematic and misguided approach to manufacture venue in the Western District of Texas

Defendant also moves this Court to dismiss his pending charges based on the claim that the government is "manufacturing" venue in the Western District of Texas, when Defendant's case should have been filed in the District of New Mexico instead. Mot. 9–11, ECF No. 23. Defendant states that "[t]he District of New Mexico has a formal Fast Track Policy, whereby § 1324 defendants can agree to waive certain rights and receive quick disposition and considerable downward departures at sentencing." Mot. 9, ECF No. 23. The Government responds to these assertions by arguing that the Court's supervisory powers do not authorize it to

dismiss the instant case. Resp. 10–11, ECF No. 27. Defendant also urges the Court to dismiss this case to send a message to law enforcement to stop creating dangerous situations for the members of the El Paso community, relating to high-speed chases and police shootings.

"The Constitution makes it clear that determination of proper venue in a criminal case requires determination of where the crime was committed." *Platt v. Minnesota Min. & Mfg. Co.*, 376 U.S. 240, 245 (1964). Venue, for purposes of a criminal case, is determined by Federal Rule of Criminal Procedure 18, which provides that "the government must prosecute an offense in a district where the offense was committed. Courts will consider "the district where the agreement was made or an overt act in furtherance of the conspiracy was committed," when determining venue for a conspiracy. *United States v. Sanchez*, 508 F.2d 388, 394 (5th Cir. 1975). In situations where an offense began in one district and was completed in another district, or was committed in more than one district, the case "may be . . . prosecuted in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a). "The court must set the place of trial within the district with due regard for the convenience of the defendant, any victim, and the witnesses, and the prompt administration of justice." Fed. R. Crim. P. 18.

In HSI's Investigation Report, Defendant admitted to law enforcement after his arrest that "[the morning of the incident] [Mr.] Segura had come to his house and they both went in [Defendant's] vehicle. [Defendant] stated that [Mr.] Segura was driving [Defendant's] vehicle. [Defendant] also stated that when they got in [Defendant's] vehicle, [Mr.] Segura handed him a pistol. [Defendant] stated he took the pistol and put it under the passenger seat of the vehicle." Mot. Ex. 3, ECF No. 23. Defendant lives in El Paso, Texas, which is in the Western District of Texas. *Id.* Defendant and Mr. Segura met in the Western District of Texas

and exchanged firearms before driving to the District of New Mexico to pick up the UNCs. And the conspiracy ended in the Western District of Texas at the Speedway gas station at Doniphan and Mesa. Mot. 2, ECF No. 23. Because "the offense was started, continued, or completed in the Western District of Texas," venue is proper in the Western District of Texas. 18 U.S.C. § 3237(a).

With regard to the potential risks members of the El Paso community face, Defendant makes the argument that Border Patrol's manufacturing of venue in the Western District of Texas "has resulted in dangerous high-speed car chases and accidents in populated neighborhoods in El Paso," and "[i]n this case, it tragically resulted in a police shooting of a man at a busy intersection, rather than in an unpopulated part of the New Mexico desert." Mot. 5, ECF No. 23. The Court would like to wholly dispel the notion that law enforcement's actions in any way created the dangerous, and indeed tragic, situation involved in this instant case. The Court takes extremely seriously the risk posed to the members of the El Paso community due to high-speed chases in migrant smuggling schemes. That, however, is not what happened here, and it was not law enforcement that created the risk of danger to the community.

As law enforcement agents approached the vehicle at the Speedway gas station in El Paso, Texas, "[Mr. Segura] exited the vehicle and walked towards the front of the store," Report, Mot. Ex.3, ECF No. 23. Agents approached Mr. Segura, requesting to speak with him. *Id.* He then "pulled out a pistol from his waistband and began yelling 'I am not going back." *Id.* At that point, law enforcement officers sought immediate cover and requested backup. *Id.*

Defendant's own admissions also prove that it was Mr. Segura that created the

imminent and deadly threat to the El Paso community, law enforcement, the UNCs in the car, and Defendant himself. Defendant admitted that "after they had picked up the UNCs, [Defendant] noticed vehicles following them. [Defendant] stated that he told Mr. Segura they were going to get arrested and told him to just pull over. Mr. Segura stated that he would not pull over." Report of Investigation ("Report") dated October 16, 2023, Mot. Ex. 4, ECF No. 23. After a multiple-hour standoff at the Speedway gas station, Mr. Segura was shot and killed by police after a chemical agent was deployed and he emerged from the gas station, allegedly pointing a gun at the law enforcement officers.[11]

*Conclusion*

The Court finds that venue is proper in the Western District of Texas, and that law enforcement did not take any action to "manufacture" venue in the Western District of Texas. The Court does not find that the Government engaged in "misconduct or gross negligence in prosecuting" this case, and therefore the Court cannot use its supervisory powers to "impose the extreme sanction of dismissal" as it is not appropriate here. *Fulmer*, 722 F.2d at 1195. And finally, the Court finds that the driver of Defendant's vehicle, Mr. Segura, created the threat that endangered the lives of the El Paso residents, not law enforcement.

## **CONCLUSION**

Defendant Jacob Hernandez requests of this Court to dismiss the instant case because he believes his due process rights under the Fifth Amendment, and compulsory process

---

[11] *See* Daniel Borunda, Man shot, killed in El Paso SWAT standoff at Speedway gas station in the Upper Valley, EL PASO TIMES, Oct. 16, 2023, available at:
https://www.elpasotimes.com/story/news/crime/2023/10/16/el-paso-swat-standoff-shooting-man killed-speedway-gas-station-doniphan/71203848007/.

rights under the Sixth Amendment were violated by the Government when it deported the three UNCs present in Defendant's car at the time of his arrest. Additionally, he requests dismissal because he believes that law enforcement engaged in a systematic approach to manufacture venue in the Western District of Texas, thereby endangering the El Paso community.

The Government contends Defendant was not prejudiced by the deportation of the three UNCs and Defendant did not describe with enough specificity how their testimony would benefit Defendant's case. Further, the Government also contends that law enforcement did not manufacture venue in the Western District of Texas.

The Court agrees with the Government on all points. Dismissal is not appropriate under either of the grounds that Defendant argues. The Court finds that neither Defendant's Fifth nor Sixth Amendment rights were violated by the Government's actions, nor that venue was manufactured in the Western District of Texas.

Accordingly, **IT IS HEREBY ORDERED** that "Defendant's Motion to Dismiss," ECF No. 23, is **DENIED**.

SIGNED this 15th day of **APRIL 2024**.

_____
THE HONORABLE DAVID BRIONES
SENIOR UNITED STATES DISTRICT JUDGE